**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **1210 McGAVOCK STREET** | ) | |
| **HOSPITALITY PARTNERS, LLC,** | ) | |
| **d/b/a ADELE'S RESTAURANT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-694** |
| | ) | **Judge Aleta A. Trauger** |
| **ADMIRAL INDEMNITY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This case is one of many nationwide challenging the denial of insurance coverage for business losses incurred as a result of governmental orders closing or limiting the operation of various businesses around the country, including restaurants, in efforts to stem the spread of the 2019 novel coronavirus ("COVID-19" or "coronavirus") after it was first recognized as a pandemic by the World Health Organization in March 2019. Now before the court is defendant Admiral Indemnity Company's Motion to Dismiss Complaint (Doc. No. 10), seeking judgment in its favor on the plaintiff's claims for a declaratory judgment and damages arising from the defendant's alleged breach of a commercial insurance policy when it denied the plaintiff's claim for coverage. For the reasons set forth herein, the motion will be granted, and this case will be dismissed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff 1210 McGavock Street Hospitality Partners, LLC, d/b/a Adele's Restaurant ("Adele's" or "plaintiff") filed suit in the Chancery Court for Davidson County, Tennessee on July

15, 2020. (Compl., Doc. No. 1-2, at 4–19.[1]) Defendant Admiral Indemnity Company ("Admiral" or "defendant") promptly removed the case to this court on the grounds of diversity jurisdiction. (Doc. No. 1.)

The plaintiff owns and operates a restaurant in Nashville, Tennessee. In exchange for "substantial premiums," it purchased from Admiral a commercial property insurance policy ("Policy"), in effect from January 1, 2020 through January 1, 2021. (Policy, Doc. No. 11-1, at 2.) Adele's characterizes the policy as an "all risk" policy that "provides broad coverage for losses caused by any cause unless expressly excluded." (Compl. ¶ 23.)

On March 15, 2020, pursuant to a Declaration of Public Health Emergency adopted by the Board of Health for Metropolitan Nashville and Davidson County ("Metro"), the Chief Medical Director for Metro's Public Health Department issued an order limiting the plaintiff and other restaurants in Nashville to "half the capacity specified" in their "food service establishment permit[s]," effective March 17, 2020. (Compl. ¶ 3.) On March 20, 2020, the order was amended to prohibit the plaintiff and other restaurants from allowing any on-premises dining services "until further notice." (*Id.*; *see also* Amended & Restated Order 1, Doc. No. 1-2, at 20.) The amended order specifically did not prohibit restaurants from receiving call-in orders and offering curbside, take-out, drive-through, and delivery of prepared food and beverage. (Doc. No. 1-2, at 20.) In a subsequent order, effective March 23, 2020, the Metro Nashville Health Department issued a "Safer at Home Order," directing the closure of all "non-essential" businesses through May 10, 2020. (Compl. ¶¶ 4, 42.) Adele's alleges that this order required it to close and prohibited the public from accessing its restaurant, thereby causing the "necessary suspension of its operations"

---

[1] The defendant's attachment to the Notice of Removal includes all of the state court pleadings, not just the Complaint.

as contemplated by the "Civil Authority" clause of the Policy, discussed below. (Compl. ¶¶ 43, 44.) However, the April 1, 2020 Amended and Restated Order 3 attached to the Complaint specifically permitted restaurants to continue providing "take-out, window, drive-through or curb-side service," as long as they complied with "CDC guidance on social distancing and gathering sizes." (Doc. No. 1-2, at 22.) On May 11, 2020, restaurants and bars were permitted to provide on-premises dining at fifty percent capacity while maintaining social distancing. On May 23, 2020, Nashville restaurants were permitted to open at seventy-five percent capacity while still maintaining social distancing. In June 2020, restaurants were briefly permitted to reopen to full capacity before again being restricted to seventy-five percent. On July 3, Nashville went back to restricting restaurants to fifty percent capacity. (*Id.*) (These public health orders are collectively referred to, below, as the "closure orders.")

As a result of the closure orders, the plaintiff's ordinary business operations were substantially interrupted, and remain interrupted, resulting in significant lost revenues and forcing the plaintiff to furlough or lay off many of its employees. (Compl. ¶ 6.) Believing that the Policy covered it for loss attributable to business interruption, Adele's submitted a claim to Admiral following the March 15, 2020 closure order, which was denied by letter ("Denial Letter") dated April 10, 2020. (Compl. ¶ 9; *see also* Denial Letter, Doc. No. 1-2, at 39.)

As set forth in the Denial Letter, Admiral's denial of the claim submitted by Adele's was premised, first, upon the defendant's interpretation of the Policy's coverage for loss of Business Income, which states as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises [covered by the Policy]. The loss or damage must be caused by or result from a Covered Cause of Loss . . . .

(Doc. No. 1-2, at 40; *see also* Policy, Business Income (and Extra Expense) Coverage Form ¶ 1 ("Business Income Clause"), Doc. No. 11-1, at 57.) Admiral's Denial Letter stated that it had not received notice of "any physical damage" to the covered premises, based on which it concluded that there was "no coverage under the Policy for any loss of business income" resulting from curtailment of business operations due to restrictions imposed to prevent the spread of the coronavirus. (Doc. No. 1-2, at 40.)

Admiral also pointed to the Policy description of coverage for actions by "Civil Authorities," which states:

> When a Covered Cause of Loss causes damage to property other than property at the [covered] premises, we will pay for the actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access to the [covered] premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [covered] premises are within that area but not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Doc. No. 1-2, at 40–41; *see also* Policy, Business Income (and Extra Expense) Coverage Form ¶ 5.a. ("Civil Authority Clause"), Doc. No. 11-1, at 58).) Admiral stated that this provision also did not provide coverage, because there was no physical damage from a covered cause of loss to other property, and no civil authority had limited physical access to the plaintiff's restaurant. (Doc. No. 1-2, at 41.)

The Denial Letter also relied on the Policy endorsement entitled "Exclusion of Loss Due to Virus or Bacteria," Form CP 01 40 07 06. (Doc. No. 1-2, at 41.) This Endorsement provides, in relevant part:

> A. The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.
>
> B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(Doc. No. 1-2, at 41; *see also* Policy, Exclusion of Loss Due to Virus or Bacteria ("Virus Exclusion Clause"), Doc. No. 11-1, at 80).)

Finally, the Denial Letter pointed to the "Causes of Loss – Special Form" of the Policy, defining the term "Covered Causes of Loss" to mean "Risks of Direct Physical Loss" unless the loss is expressly excluded by Section B, "Exclusion," or limited in Section C, "Limitations." (Doc. No. 1-2, at 42.) The referenced "Exclusions" paragraph excludes coverage for losses incurred as a result of "[a]cts or decisions . . . of any . . . governmental body." (Policy, Causes of Loss – Special Form ¶ B.3.b., Doc. No. 11-1, at 72.) Admiral explained that its decision to deny coverage was based on its understanding that

> the restaurant has temporarily curtailed its operations, in whole or in part, in response to the current public health emergency and related actions by governmental authorities to restrict public gatherings in an effort to prevent or mitigate the spread or effects of the coronavirus. . . .
>
> Because we have concluded that there exists no coverage for your claim as stated in the Notice of Loss, we have not investigated and have not addressed the issues of loss measurement and application of deductible.

(Doc. No. 1-2, at 42–43.)

The Complaint contests these reasons for the denial of coverage, but as a matter of contract interpretation rather than as a matter of contested facts. The plaintiff asserts that "[t]he Policy does not define the phrase 'direct physical loss of or damage to covered property'" (Compl. ¶ 25) and that the phrase "may be reasonably interpreted to occur when a covered cause of loss threatens or

renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy and/or continued use" (Compl. ¶ 27). The plaintiff asserts that "[c]ontamination of the Plaintiff's property would be a direct physical loss requiring remediation to clean the surfaces of the Plaintiff's restaurant" and that there is an "ever-present risk that the Plaintiff's property is contaminated and will continue to be contaminated." (Compl. ¶¶ 39. 41.) The Complaint alleges that Nashville's closure orders were made "in direct response to the continued and increasing presence of the coronavirus on property on or around Plaintiff's premises" and that, by prohibiting the public from accessing the plaintiff's restaurant, the closure orders caused the suspension of its operations and triggered the "Civil Authority coverage" under the Policy. (Compl. ¶¶ 42, 43.)

The plaintiff also asserts that the Virus Exclusion Clause "does not apply to the 'business losses' incurred by Plaintiff here." (Compl. ¶ 34.) In support of this claim, it states, in an entirely conclusory fashion, that, insofar as the closure orders constitute "direct physical loss of or damage to" the covered premises, "the Virus Exclusion simply does not apply." (Compl. ¶ 49.) Second, it claims that, even if such direct physical loss or damage was caused by the coronavirus, the defendant should be estopped from enforcing the Virus Exclusion, based on "principles of regulatory estoppel, as well as general public policy." (Compl. ¶ 50.) Its "regulatory estoppel" argument is based on purported misrepresentations allegedly made by "insurance industry trade groups" in 2006 in order to persuade state insurance regulators to permit insurers to adopt virus exclusion clauses. (Compl. ¶¶ 51–57.)

The defendant has now filed it Motion to Dismiss and supporting Memorandum of Law, along with a complete copy of the Policy. (Doc. Nos. 10, 11, 11-1.) Its arguments largely mirror those set forth in the Denial Letter, which are based on its interpretation of the wording in the Policy itself, but Admiral also posits that no Tennessee court has adopted the doctrine of regulatory

estoppel and that the Sixth Circuit has strongly indicated that it would not apply under Tennessee law.

The plaintiff has filed a Response (Doc. No. 16), basically reiterating the arguments made in the Complaint, and the defendant filed a Reply (Doc. No. 19).

## II.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

"In evaluating a motion to dismiss, we 'may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.'" *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 863 (6th Cir. 2020) (quoting *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016)). Accordingly, even though the plaintiff did not attach the complete Policy to the Complaint, the court may consider the Policy submitted with the defendant's Motion to Dismiss. *Accord Ryniewicz*, 803 F. App'x at 863–64 (affirming dismissal of breach of contract claim, based on the terms of the contract attached to the defendant's motion).

## III.     DISCUSSION

In this diversity case, the court applies substantive state law to questions involving contract interpretation. *See Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989). There is no dispute in this case that Tennessee law applies, and, under Tennessee law, "[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012). When the language of an

insurance policy is clear and unambiguous, the court is bound to give effect to that language. *Id.* at 441. Under Tennessee law, the court should read an insurance contract as a layperson would read it. *Paul v. Ins. Co. of N. Am.*, 675 S.W.2d 481, 484 (Tenn. Ct. App. 1984). "Where an all-risk insurance policy is involved, the insurer must show that an exclusion applies in order to avoid liability, and exclusionary clauses are to be strictly construed against the insurer." *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001) (citations omitted).

The defendant basically makes three arguments in support of its Motion to Dismiss: (1) the Virus Exclusion Clause precludes recovery under the Policy altogether, even if the plaintiff's claims otherwise fell within the scope of covered claims; (2) even if the Virus Exclusion Clause does not apply, the plaintiff does not plausibly allege that it suffered "direct physical loss of or damage to property," as required for Business Income Clause; and (3) the plaintiff fails to allege that the closure orders actually had the effect of prohibiting access to the plaintiff's restaurant, as required by the Civil Authority Clause. The court finds that all of the defendant's arguments have merit.

### A. The Virus Exclusion Clause

As set forth above, the Policy excludes coverage for "loss or damage caused by or resulting from any virus . . . or other microorganism that induces or is capable of inducing physical distress, illness or disease." (Doc. No. 1-2, at 80.) Even if the plaintiff could show that it suffered covered losses under either the Business Income Clause or the Civil Authority Clause, the Virus Exclusion Clause precludes coverage. This exclusion extends to "all coverage and endorsements" under the Policy, specifically including the endorsements covering property damage to buildings and those that cover "business income, extra expense or action of civil authority." (*Id.*)

The plaintiff insists that the exclusion does not apply here, because the restaurant's "business interruption" was not actually caused by the virus, since no employee or patron was ever known to test positive, and there is no "indication that the virus was present on the property." (Doc. No. 15, at 18.) Rather, its losses were caused by the closure orders. The defendant argues that there is no dispute that the closure orders "stemmed from the COVID-19 pandemic" (*see* Compl. ¶ 61) and were intended to disrupt the spread of the virus and, thus, that virus is the true cause of the plaintiff's loss.

Numerous courts presented with the question have held that similar exclusions bar coverage for business losses stemming from closures implemented for the purpose of attempting to mitigate the spread of the coronavirus. For instance, the Eastern District of Michigan addressed a policy exclusion barring coverage for loss that would not have occurred but for some "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness, or disease." *Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020). The plaintiff there, like the plaintiff here, argued that the virus exclusion did not apply, because its business loss was due, not to COVID-19, but to a closure order. The court was not persuaded:

> Plaintiff's contention that the Order was the "sole, direct, and only proximate cause" of Plaintiff's losses is refuted by the Order itself. The Order expressly states that it was issued to "suppress the spread of COVID-19" and accompanying public health risks. The only reasonable conclusion is that the Order—and, by extension, Plaintiff's business interruption losses—would not have occurred but for COVID-19. Plaintiff is therefore wrong to suggest that "whether the reason for the [Order] was preventing the spread of a virus or an asteroid spreading magic dust is irrelevant." If it were the latter, the Virus Exclusion would not apply.

*Id.* (internal record citations omitted); *accord Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, Nos. 20-1869, 20-1869, 2020 WL 7395153, at *8 (E.D. Pa. Dec. 17, 2020) ("In an attempt to circumvent this exclusion, the insureds argue that the cause of their losses and damages is the

shutdown orders, not the COVID-19 virus. This effort fails."); *Mauricio Martinez, DMD, P.A. v. Allied Ins. Co. of Am.*, No. 220CV00401FTM66NPM, 2020 WL 5240218, at \*2 (M.D. Fla. Sept. 2, 2020) (where the policy at issue contained an exclusion for loss or damage caused "directly or indirectly," by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," holding that, because the plaintiff dental practice's damages "resulted from COVID-19, which is clearly a virus, neither the Governor's executive order narrowing dental services to only emergency procedures nor the disinfection of the dental office of the virus is a 'Covered Cause of Loss' under the plain language of the policy's exclusion"); *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-CV-04434 JSC, 2020 WL 5642483, at \*2 (N.D. Cal. Sept. 22, 2020) ("Thus, as the loss was caused directly or indirectly by the virus, the Virus Exclusion applies under its plain and unambiguous language. . . . [U]nder Plaintiffs' theory, the loss is created by the Closure Orders rather than the virus, and therefore the Virus Exclusion does not apply. Nonsense.").

The plaintiff has located only one case holding to the contrary: *Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co., Ltd.*, No. 6:20-cv-1174-Orl-22EJK, 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020). In that case, the court denied the defendant insurance company's motion to dismiss the plaintiff's COVID-related breach of policy claims, finding that "several arguably ambiguous aspects of the Policy make determination of coverage inappropriate at this stage," particularly because certain "forms" referenced in the exclusion for loss caused by a "virus" were not included in the policy or provided to the court. *Id.* at \*4. The court concluded that it could not construe the policy as a matter of law in the absence of those forms. *Id.*

The same considerations do not apply here, where the defendant produced the entire Policy with its Motion to Dismiss, and the plaintiff does not contend that any exclusions set forth in the

Policy are modified by forms that have not been produced to the court. The court finds that the clear and unambiguous language of the Virus Exclusion Clause precludes coverage of the plaintiff's claims. The language of the closure orders establishes that the orders would not have been issued were it not for the threat posed by the coronavirus, which is indisputably a virus. The plaintiff's loss thus "result[ed] from" the coronavirus, and the Virus Exclusion Clause applies.

The plaintiff attempts to avoid this conclusion by arguing that the doctrine of regulatory estoppel bars enforcement of the Virus Exclusion Clause. The plaintiff acknowledges that no Tennessee court has adopted the doctrine of regulatory estoppel. Tennessee courts have long held, however, that extrinsic evidence may not be introduced to modify the terms of an unambiguous contract. *See, e.g.*, *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697 (Tenn. 2019) (holding that extrinsic evidence "may not be used to vary, contradict, or supplement the contractual terms in violation of the parol evidence rule"). The Sixth Circuit has declined to apply regulatory estoppel based on Kentucky law, which likewise does not allow the admission of extrinsic evidence to "vary the terms of an unambiguous contract." *Transam. Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 373 (6th Cir. 1995) (citing *J. Walter Wright Lumber Co. v. Red Bird Timber Corp.*, 379 S.W.2d 721, 723 (Ky. 1964)).

In *Duro Bag*, the insured argued that the insurer should be estopped from relying on a "pollution exclusion clause because the insurance industry deliberately misrepresented the meaning of that clause to state regulators." *Id.* The Sixth Circuit stated: "Because we have concluded that the language of the policy is unambiguous, we decline to go behind the face of the policy and examine its drafting history." *Id.* The plaintiff here makes an identical argument: that the insurance industry as a whole misrepresented the meaning of virus exclusion clauses, during a nationwide effort in 2006 to obtain state insurance regulators' approval of the virus exclusion

clauses. (Compl. ¶¶ 51–56.) This court likewise declines to "go behind the face" of the Policy at issue here, where the Virus Exclusion Clause is unambiguous, and Tennessee law does not permit the introduction of extrinsic evidence under these circumstances.

The plaintiff also alleges in the Complaint that the defendant should be estopped from enforcing the Virus Exclusion Clause as a matter of "general public policy," without further explaining or supporting this position. (Compl. ¶ 50.) Admiral does not address public policy in its Memorandum, and the plaintiff, in its Response, asserts simply: "Defendant . . . does not address the allegations that the purported exclusion is also against public policy." (Doc. No. 16, at 20.) It provides no legal argument, in either the Complaint or its Response, as to why the Virus Exclusion Clause violates public policy. However, as the defendant points out in its Reply (Doc. No. 19, at 10 n.5), Tennessee courts have held that "'clearly worded exclusion[s]' that limit, but do not completely negate, other general provisions within a policy, are not contrary to public policy." *Setters v. Permanent Gen. Assur. Corp.*, 937 S.W.2d 950, 952 (Tenn. Ct. App. 1996) (citing *Beef N' Bird of Am., Inc. v. Continental Cas. Co.*, 803 S.W.2d 234, 237 (Tenn. Ct. App. 1990)). The Virus Exclusion Clause does not negate the general coverage provided by the Policy and does not violate Tennessee public policy.

Because the Virus Exclusion Clause clearly precludes coverage for the business losses incurred by Adele's, the defendant is entitled to judgment in its favor as a matter of law on both the breach of contract claim and the claim for declaratory relief, which itself would require a finding that the defendant breached the Policy by denying relief.

## B. The Business Income Clause

Even if the Virus Exclusion Clause did not apply, the court also finds that the plaintiff's claim falls outside the terms of the Business Income Clause of the Policy, which expressly provides coverage only for "direct physical loss of or damage to Covered Property" at the plaintiff's

premises "caused by or resulting from any Covered Cause of Loss." (Doc. No. 11-1, at 30.) More specifically, the defendant agreed to

> pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by *direct physical loss of or damage to property* at premises [covered by the Policy]. The loss or damage must be caused by or result from a Covered Cause of Loss . . . .

(*Id.* at 57 (emphasis added).) The plaintiff cannot show that the closure orders—or the coronavirus itself—caused "direct physical loss of or damage to Covered Property." (*Id.* at 30.)

The plaintiff argues that the Policy does not define the terms "physical," "loss of," or "damage to" and that, under Tennessee law, the court must interpret these terms "fairly and reasonably, giving the language its usual and ordinary meaning." (*Id.* at 6 (quoting *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 306 (Tenn. 2007)).) Quoting various dictionary definitions, which are not contested, the plaintiff posits that "physical" generally means to have an objective, material, perceptible existence, as opposed to imaginary, fictitious, or pertaining to the imagination, soul, or emotions. (*Id.* at 7 (citations omitted).) It also points out that dictionaries define "loss" and "damage" to include both physical damage to property as well as the loss of use or income and reduction in value, usefulness or normal function. (*Id.* (citations omitted).)

From there, its argument becomes more vague and even less convincing. It contends, without explanation, that it has adequately "alleged that its property has suffered physical damage and loss in all forms, including alteration to its structure, composition, or form *and* loss of access, loss of use, and loss of functionality." (*Id.* at 8 (citing Compl. ¶ 41).) In the referenced paragraph of the Complaint, Adele's alleges that "[t]he continuous presence of the coronavirus on or around Plaintiff's premises rendered the premises unsafe, uninhabitable, and substantially unsuited for its intended use and, therefore, caused physical property damage or loss under the Policy." (Compl.

¶ 41.) Elsewhere, however, the plaintiff itself effectively concedes that the virus did not cause direct physical loss or damage, since, as it argues, no employee or patron of the restaurant tested positive for coronavirus, and "there is no indication that the virus was present on the property." (Doc. No. 16, at 18.)

Regardless, those courts that have considered a similar argument have almost unanimously rejected it. In particular, a recent opinion from the Eastern District of Pennsylvania, addressing claims against Admiral under an identically worded policy, found as follows:

> Admiral contends that the insureds must allege some distinct, demonstrable, physical alteration of the insured properties . . . to satisfy the "damage to property" requirement. It argues that the policy covers only tangible, physical damage, such as a structural change, not economic damage. Citing the "physical loss of or damage to property" language appearing only in the business income provision, the insureds counter that a loss of functionality, usability or habitability is sufficient.

> Property damage is "a distinct, demonstrable, physical alteration of the property." 10A Couch on Ins. § 148.46 (3d ed. 1995) (citations omitted). Pure economic losses are intangible and do not constitute property damage. 9A Couch on Ins. § 129.7.

> Reading the . . . business income provisions in the context of the entire policy, we conclude that the damage must be physical. . . .

> The business income provision covers losses sustained by the suspension of operations during the "period of restoration." This term is given special meaning in the policy. It is defined as ending "when the property . . . should be repaired, rebuilt or replaced." This definition informs that the loss or damage to the property must be physical, affecting the structure of the property. It speaks to the time to "repair, rebuild or replace" the property, terms connoting structure.

> There was no physical damage to the insureds['] properties alleged in the amended complaints. Thus, because they have not alleged facts showing . . . "a direct physical loss of or damage to" their own properties, the insureds have not established coverage under the civil authority or the business income provisions.

*Newchops Rest.*, 2020 WL 7395153, at *4–5 (internal citations and footnotes omitted).

Similarly, in *Turek Enterprises*, the plaintiff argued that the term "'physical loss to Covered Property' includes the inability to use Covered Property." 2020 WL 5258484, at *6. The court

acknowledged that this interpretation might be "consistent with one definition of 'loss'" but that such an interpretation would

> ultimately render[] the word "to" meaningless. "To" is used here as a preposition indicating contact between two nouns, "direct physical loss" and "Covered Property." Accordingly, the plain meaning of "direct physical loss to Covered Property" requires that there be a loss *to* Covered Property; and not just any loss, a *direct physical loss*.

*Id.* (footnotes and citations omitted; emphasis in original).

The court agrees with both of these assessments, and both apply equally well here, even though the Policy uses the preposition "of" ("loss of") instead of "to." The plaintiff has certainly suffered economic loss, but it is unable to show that it has suffered "direct physical loss *of* or damage *to*" the premises or property covered by the Policy. Consequently, its reliance on *Studio 417, Inc. v. Cincinnati Insurance Co.*, No. 20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) (Bough, J.) (and other opinions issued by the same judge) is unpersuasive.

In *Studio 417*, the plaintiffs also alleged business interruption losses arising from coronavirus-related closure orders that their insurer refused to compensate. The court denied the defendant's motion to dismiss, finding that the plaintiffs had "adequately alleged a direct physical loss." *Id.* at *4. *Studio 417* is distinguishable from this case, because the policy in that case covered losses arising from "accidental physical loss *or* accidental physical damage to property." *Id.* at *5 (emphasis original). According to the court, the defendant's insistence on a showing of tangible damage "conflat[ed] 'loss' and 'damage'" and was inconsistent with "giv[ing] meaning to both terms." *Id.* Moreover, the plaintiffs "plausibly alleged that COVID-19 particles attached to and damaged their property." *Id.* at *6. By contrast, in this case, Adele's specifically asserts that "there is no indication that the virus was present on the property" (Doc. No. 16, at 18), and Admiral's proposed interpretation would not make the phrase "direct physical loss" redundant. The analysis in *Studio 417* has no application here.

The plaintiff's reliance on *Southeast Mental Health Center, Inc. v. Pacific Insurance Co.*, 439 F. Supp. 2d 831, 837 (W.D. Tenn. 2006), is similarly unavailing. Based on that case, the plaintiff claims that, under Tennessee law, "a loss of functionality" constitutes "physical damage." (Doc. No. 16, at 8.) The plaintiff in that case was a non-profit facility that provided outpatient mental health services and substance abuse treatment. It suffered business interruption of several weeks and consequent economic losses due to storm-related electrical and telephone outages; it also alleged that the power outage "damaged its pharmacy computer . . . which resulted in the loss of data from the computer" and rendered it unable to fill patients' prescriptions, thus also causing loss. *Se. Mental Health Ctr.*, 439 F. Supp. 2d at 833. The policy at issue in that case, like the Policy here, provided coverage for necessary suspension of business operations "caused by direct physical loss of or damage to property at the [covered] premises." *Id.* at 836. The court held that "the words 'direct physical' modify both 'loss of' and 'damage to.'" *Id.* at 837. Although the power outage clearly caused business interruption and thus economic loss, it was also undisputed that "the electrical and telephone outages were caused by damage to power and utility lines that were not located on Plaintiff's property." *Id.* at 837. The court held that "the power outage therefore does not constitute 'direct physical loss of or damage to' Plaintiff's property." *Id.* at 837.

On the other hand, the court also found that "corruption of the pharmacy computer" caused by the power outage did "constitute[] 'direct physical loss of or damage to property.'" *Id.* at 838. Specifically with respect to the damage to the computer—a physical object on the covered premises—the court held that the term "'physical damage' is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality." *Id.* (quoting *Am. Guarantee & Liab. Ins. Co. v. Ingram Micro, Inc.*, No. CIV. 99-185 TUC ACM, 2000 WL 726789, at *2 (D. Ariz. Apr. 18, 2000)). Notably, the court did not

apply the same reasoning to the plaintiff's complete "loss of use" of its facility during the power outage or the facility's "loss of functionality" resulting from the power outage. Rather, loss of functionality was considered to be physical damage only insofar as it related to a physical object located on the covered premises. This case does not come to the plaintiff's aid.

Although there is no dispute that the closure orders resulted in suspension of Adele's business operations, such suspension was not "caused by direct physical loss of or damage to property at [the covered] premises." (Doc. No. 11-1, at 57.) Consequently, Adele's loss is not covered by the Business Income Clause.

### C.    Civil Authority Clause

Finally, Adele's also argues that its loss is covered by the Civil Authority Clause, because its loss is the "'direct' result of the governmental orders which rendered Adele's property unusable for its intended purpose." (Doc. No. 16, at 8.) More specifically, it claims that it suffered a "physical loss of covered property including loss of access, use and functionality of the dining area for its intended purposes." (*Id.*) The cases to which it cites in support of this argument all involve some physical damage to the covered property, including landslides, pooling gasoline, and asbestos fibers rendering the structure uninhabitable. (*See id.* at 9–10.[2]) It also cites to *Southeast Mental Health Center*, again for the proposition that "a loss of functionality" constitutes "physical damage," a premise the court has already rejected. None of these cases supports the conclusion that the plaintiff's loss in this case is covered by the Civil Authority Clause.

More specifically, in order for the Civil Authority Clause to apply,

---

[2] *See Hughes v. Potomac Ins.*, 18 Cal. Rptr. 650 (Cal. Ct. App. 1962) (landslide); *W. Fire Ins. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (pooling gasoline under and around structure); *Sentinel Mgmt. Co. v. New Hampshire Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997) (contamination of structure due to asbestos fibers).

(1) a "Covered Cause of Loss" must cause "damage to property other than property at the [covered] premises," which

(2) results in "action by civil authority," and

(3) "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [covered] premises are within that area but not more than one mile from the damaged property," and

(4) "action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

(Doc. No. 11-1, at 58.)

The plaintiff's arguments notwithstanding, this provision does not apply, because (1) the coronavirus did not cause property damage, meaning actual physical damage, and the Complaint does not actually even allege property damage to some neighboring property; (2) the closure orders, which certainly constitute "action by civil authority," were issued to control the spread of the coronavirus by limiting close human interaction, not because of "dangerous physical conditions" at a neighboring property—and, again, the plaintiff does not allege an actual case of "dangerous physical conditions" at another location; and (3) the closure orders did not prohibit physical access to the plaintiff's restaurant or the area around it. The most natural reading of "access," in this context, is physical access, not simply being closed to the public. The plaintiff does not allege that it was ever physically unable to access the restaurant.

Thus, the plaintiff's loss would not be covered by this provision, even if the Virus Exclusion Clause did not apply.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant the Motion to Dismiss.

The plaintiff requests that, if the court is inclined to grant the motion, it be granted leave to amend the Complaint, particularly to enable it to "more completely set out the doctrine" of

regulatory estoppel and the facts relating to its "other causes of action." (Doc. No. 16, at 20.) The court construes this as a request that the dismissal of the claims be without prejudice rather than with prejudice.

Because the court finds as a matter of law that the doctrine of regulatory estoppel does not apply, additional pleading would not salvage the claim. Likewise, because the conclusion that the plaintiff's causes of action for breach of contract and for a declaratory judgment fail as a matter of law based on the plain language of the Policy, further amendment of the factual allegations or clarification of the causes of action would not enable the claims to proceed. The dismissal of the Complaint, therefore, will be with prejudice. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge